## Louisville and Nashville Railroad Company v. Simpson.

(Decided September 22, 1916.)

Appeal from Clark Circuit Court.

1. Master and Servant—Liability of Master to Servant.—Neither the master nor his servant is liable to another servant for mere mortification of feeling or even fright unaccompanied by physical injury, which may be caused by the acts of the first servant in cursing the second, or in ordering him from his house after the second servant has cursed in the presence of the wife of the first.

2. Assault and Battery—Acts Constituting Assault.—The cursing of one by another, unaccompanied by any show of force or offer or attempt at corporeal injury, and which does not put him in fear of immediate danger, is not an assault.

3. Assault and Battery—Damages.—Where A is the first aggressor, cursing B in the presence of B's wife, he cannot recover damages of B for any mortification of feeling caused either by B's retaliatory cursing of him or ordering him from his home.

BENJAMIN D. WARFIELD, PENDLETON, BUSH & BUSH and SHELBY, NORTHCUTT & SHELBY for appellant.

HAYS & HAYS for appellee.

OPINION OF THE COURT BY JUDGE SETTLE.—Reversing.

The appellee, Jesse Simpson, brought this action in the Clark circuit court seeking to recover of the appellants, Louisville and Nashville Railroad Company and Roscoe Schoonover, damages upon two grounds: the first paragraph of the petition alleging a personal injury caused appellee by a blow on the head from a small stone which, by the alleged negligence of the appellants, in some unaccountable way became loose and fell upon him from the top of the wall of a cut in which he and other section hands in appellant's employ were at the time at

work constructing a new railroad track, under the supervision of its section foreman, Roscoe Schoonover. The second paragraph of the petition sought a recovery for an alleged assault upon appellee by the appellant Schoonover because of the former's refusal, as claimed, to sign an acquittance releasing the appellant railroad company from damages on account of his personal injuries.

On the trial the circuit court, being of the opinion that the evidence failed to show that the blow on the head received by appellee from the falling stone was caused by any negligence on the part of appellants, and that the injury resulted from an assumed risk incident to appellee's employment, instructed the jury to allow him no damages therefor, but permitted the case to go to the jury upon the cause of action set up in the second paragraph of the petition. A verdict was returned awarding appellee damages against the two appellants in the sum of $400.00. Appellants were refused a new trial and, proceeding in conformity to rule 20 of this court, they have therein prayed an appeal from the judgment entered upon the verdict in question.

As the correctness of the trial court's action in refusing appellee a recovery upon the cause of action set out by the first paragraph of the petition is not before us for review, by cross-appeal or otherwise, it only remains to be determined whether the case should have gone to the jury upon the cause of action alleged in the second paragraph of the petition. It is appellants' contention that neither the averments of the second paragraph of the petition nor the evidence offered in support thereof entitled appellee to recover of them or either of them the damages claimed, for which reason the trial court erred in refusing the peremptory instruction directing a verdict for them, asked at the conclusion of the evidence.

Reduced to concrete form the cause of action relied on in the second paragraph of the petition is that the appellant Schoonover, when appellee refused to sign a paper presented him, said to appellee that if he could not sign the paper he could leave his (Schoonover's) house, and that Schoonover then cursed appellee, and further said to him that he believed he had wanted to get hurt. Appellee's claim as to what was then actually said and done by Schoonover can better be ascertained from the following testimony given by him on his direct examination:

"Q. Well, what then occurred? A. Well, after I stayed at the foreman's for four days, he came in one

evening and brought papers for me to sign, asked me to sign them. I said, 'No, Roscoe, I don't want to sign any paper.' Q. What papers were they? A. He said 53 and 63. I said, 'Roscoe, I won't sign 63, I will sign 53.' He cussed and said, 'Damn you, you will sign it.' I said, 'I won't.' He said, 'God damn you you wanted to get hurt;' said 'If you can't sign the papers, you can get out of my house, I guess.' I couldn't help but cry; I went down to Mr. Young's  *  *  *  Q. What paper did he say it was, told you to sign? A. He just brought a paper to me, said, 'Here, sign this paper.' He had it all ready, about made out; I said, 'No Roscoe, I don't want to sign that paper now, plenty of time for me to sign the paper.' He said, 'God damn you, you can get out of my house,' that is the words he said? Q. What was his attitude, friendly or not? A. No, sir, he was mad, seemed like he come in mad, or something or another; I don't know what was the matter with him.''

It further appears from his testimony, as well as that of Schoonover, that paper 53, signed by him, contained a statement of the time he had worked for the railroad company and the amount due him therefor. It is not clear from appellee's testimony what the contents of paper 63 were, but apparent from the testimony of Schoonover and one or two other employes of the railroad company, and uncontradicted by appellee, that it contained what purported to be a statement as to the manner in which appellee had received the injury to his head from the falling stone, and also that the paper had been signed by some of the railroad company's employes who witnessed the accident, before it was presented to appellee by Schoonover for his signature. The facts last stated are in part shown by the following excerpts from the testimony of Schoonover:

''Q. Please just state what happened at that time? A. What happened at the time I asked him to do that (sign paper 63)? Q. Yes. A. This afternoon some of the boys were in the other house just before work time at noon; I let all the boys—called them all in there just before that, who saw it hit him, you know; asked him to sign, handed the report to Jesse to sign, told him to sign, asked him to sign it; he said he wasn't going to sign anything. I said, 'Well, it aint nothing to me if you don't sign it, I just asked you.' Q. So that the same report you had asked the others to sign, you asked him to sign? A. Yes, sir.''

With respect to what appellee then said and did Schoonover further testified as follows:

"Q. He declined to sign? A. Yes, sir, first cursed and said he wasn't going to sign nothing. * * * Q. Did Mr. Simpson ask to have it read to him? A. I give it to him to read; he says, 'Let me see that paper.' I just handed it to him; he went ahead, went to reading it. Q. Did he ask you to read it to him? A. No, sir. Q. Did you at that time tell him that 'Damn you, sign that,' or that he couldn't stay at your house if he didn't sign that report? A. Never said anything like that. Q. Did you say anything in substance like that? A. No, sir. Q. Was there something that was unpleasant that happened between you and Mr. Simpson about him staying in that house there? A. Well, not that night I asked him; he just laid around there; I was working all the time; I 'lowed that I could get him to carry a little water, something or other around there to pay for his board; I asked him that night if he would do that; he said no, he was going to put himself in the hands of the company for a place to board; went on down to Young's; came back next day."

The following testimony was given by Schoonover on cross-examination:

"Q. Did you curse him (appellee)? A. After he cursed. He commenced to curse as my wife was standing there. Q. You did curse him? A. Yes, sir, I did curse him. * * * Q. You remember that you cursed him on the occasion that he was signing those papers? A. No, sir, didn't curse him over that at all; just give him the paper, asked him to sign it. He cursed and said he wasn't going to sign it. I told him that was all right. * * * Q. Tell all your words? A. I never cursed him at the time of signing the papers; it was that night I cursed him. Q. Just before he left your house? A. Yes, sir. Q. What did you say to him? A. He come in there and said he was going to leave, going to put himself in the hands of the company for board. He cursed, wanted his time. I cursed. Q. What did you say to him? A. I told him damn him get his time. Q. Did you say anything further to him. A. No, sir."

The conversation between appellee and Schoonover at the time the former was asked to sign the paper or papers presented him by the latter occurred some time during the afternoon, and later in the afternoon or that night appellee left Schoonover's house, went to that of a Mr.

Young, where he remained until the following day and then returned to Schoonover's house and with the consent of Schoonover remained there for at least fifteen days, at the end of which time he went to Cincinnati, having obtained through Schoonover a pass for the trip. While at Schoonover's during the fifteen days, and for the purpose of paying something toward his board, appellee did some work about the house, assisting Schoonover's wife with the cooking and doing various chores. During the same time he also did some work for a man named Burch who lived in the neighborhood. Appellee and Schoonover both testified that they had known each other about eight years prior to the coming of appellee to Schoonover's house. It will appear from what has been said of the testimony of both appellee and Schoonover that there had been the best of feeling between them down to the occurrence of the conversation at the time appellee was asked by Schoonover to sign the papers, to one of which he refused to place his signature, and the fact that appellee, after spending one night at Young's, voluntarily returned on the following day to Schoonover's residence and remained there for fifteen days, thereby renewing their cordial relations, makes it appear improbable that he was as greatly humiliated or intimidated by what was said and done to him by Schoonover before he went to Young's, as claimed by him in testifying on the trial. Furthermore, whether the cursing by Schoonover was done when appellee refused to sign the paper, or when he left the house at night, it appears from the evidence that appellee was not cursed by Schoonover until after the latter had been cursed by him and in the presence of his wife. This is clearly shown by the testimony of Schoonover and undenied by any statement contained in the testimony of appellee or that of any other witness. The view thus presented of the transaction by the evidence would seem to prove appellee to be the first aggressor or wrongdoer and make reasonable the inference that the cursing done by Schoonover was, as claimed by him, provoked by that first employed by appellee and, hence, was indulged in by way of retaliation.

But admitting for present purposes that the acts of Schoonover complained of were committed as alleged in the petition, and furthermore that Schoonover was at the time acting as an agent or servant of the appellant, Louisville and Nashville Railroad Company, and in the apparent scope of his employment as such agent or ser-

vant, it becomes important to determine whether his acts constituted an assault, as claimed, for which appellee may recover damages against either of the appellants. "An assault is an unlawful offer of corporeal injury to another by force, or force unlawfully directed toward the person of another, under such circumstances as create a well-founded fear of immediate peril." 3 Cyc. 1066. It is true that to render one liable for an assault it is not essential that any danger actually result from his act or that a blow be actually inflicted. But it is essential that there be an offer of or attempt at corporeal injury to another by force, made under such circumstances as will reasonably produce, and are calculated to produce, in the mind of the latter a well-founded fear of immediate peril to his life or person. Measured by this test, the acts of Schoonover cannot be said to have constituted an assault. There was no showing of force on the part of Schoonover, no offer of or attempt at corporeal injury to appellee and no claim upon the part of the latter that he apprehended violence from the words or conduct of Schoonover, or that he was placed in fear of immediate or any sort of peril to his life or person, at his hands. Furthermore, there is nothing in the evidence conducing to prove that the injury to appellee's head, caused by the blow from the falling rock in the cut, was in any way aggravated or increased because of his being compelled, if he was compelled, to leave the house of Schoonover, go to that of Young and there spend the night. The house of Young was near that of Schoonover and it is neither claimed nor proved that in going to Young's appellee was exposed to such weather conditions or discomfort as could have aggravated the wound on his head.

Placing upon Schoonover's acts the worst construction that might be given them from appellee's testimony, they were insufficient to cause any apprehension on appellee's part of violence to his person or health. His leaving the house of Schoonover and spending the single night at Young's was not because of any force exercised by Schoonover or of any threat or offer from him to inflict upon appellee bodily injury, but solely on account of Schoonover's statement to him that because of his refusal to sign one of the papers presented by Schoonover he could no longer remain at his house; and if, as testified by Schoonover and not denied by appellee, the latter cursed him or cursed in the presence of his wife, before any cursing was done by Schoonover, and for that reason he

was, as claimed by Schoonover, told that he could no longer remain at his house, such statement from Schoonover was excusable, notwithstanding his subsequent reprehensible retaliatory cursing of appellee.

The fact that appellee received some treatment from a physician during his stay of fifteen days at Schoonover's house, following his return there from Young's does not conduce to prove that such treatment resulted from any aggravation of the wound on his head caused by the conduct of Schoonover complained of. On the contrary, in the absence of testimony to the effect that such medical treatment was rendered necessary from such aggravating cause, of which there was not a scintilla, the presumption must be indulged that it was required by the wound itself and such physical conditions as might reasonably be expected to result from a wound of its character. It follows, therefore, that appellee was not entitled to recover damages on the ground that his injuries were aggravated by anything said or done by Schoonover.

We are further of opinion that appellee is not entitled to recover of either of the appellants on account of the mortification of feeling to which he claims to have been subjected by the acts of the appellant Schoonover in cursing him and demanding that he leave his residence. This conclusion we rest upon the following grounds: (1) If, as testified by Schoonover and not denied by appellee, he cursed Schoonover or cursed in the presence of his wife, he cannot complain of the subsequent wrongful retaliatory cursing of him done by Schoonover, for his own misconduct in the particular mentioned was the initial and consequently as much the proximate cause of his mortification as was the cursing done by Schoonover; (2) If appellee first offended by cursing in the presence of Schoonover's wife, the profanity justified the demand from Schoonover that he give up his residence with him; consequently, if the demand that he change his residence, of itself, caused appellee mortification of feeling, it resulted from his own misconduct; (3) A servant cannot recover of the master or of another servant of the master for mere mortification of feeling or even fright, unaccompanied by physical injury, which may be caused by the acts of such other servant of the character here shown to have been committed by the appellant Schoonover.

The trial court seems to have erroneously applied in appellee's behalf the measure of care and duty required

by law of a common carrier toward a passenger on one of its trains. As said in Moore on Carriers, 2nd ed., vol. 2, section 32, and declared in numerous cases decided in this jurisdiction:

"A common carrier is liable in damages to a passenger for an injury to his feeling caused by the insulting, indecent or abusive language or indecent or insulting conduct of its employes, whether conductors, motormen, ticket agents, or other employes, upon the ground of a breach of its contract which obligates it not only to safely transport the passenger, but to accord to him respectful and courteous treatment, and to protect him from insult from strangers and its own employes. And the rule applies, although the carrier did not authorize or ratify such conduct, and was not negligent in selecting the employe. In the case of female passengers the carrier's obligation is further extended so as to require that they shall be protected against obscene conduct, lascivious behavior, and every immodest and libidinous approach. The obligation of a carrier to use due diligence through its servants to protect its passengers from injury and abuse is equivalent to a guaranty that such injury and abuse shall not come from its servants themselves. A carrier is absolutely liable as an insurer for the protection of passengers against assaults and insults at the hands of its servants, unless the passenger alone is the cause of the trouble."

The question, however, of the liability of the master to the servant for the abuse or cursing of him by another servant of the master, if such liability can arise at all, must grow out of the relation of master and servant and does not arise out of a breach of the contract of employment. The master's liability to the servant for a physical injury as well as the physical and mental suffering and any disability that may result therefrom, caused by the negligence of another servant of the master, the superior in authority of the injured servant, is recognized in all jurisdictions, but it rests upon the doctrine of *respondeat superior*. We have, however, been referred to no case which holds the master liable to a servant for mere mortification of feeling resulting to him from being cursed or abused by another of his servants, unaccompanied by the infliction of some corporeal injury by force, or offer of such injury, that would constitute an assault. It would be a far reaching and dangerous thing to declare the master liable in damages for the mortification of feeling

or fright that might be caused a servant by the mere ebullitions of ill temper and profanity that may be and frequently are displayed by another servant of the master in authority over him, however reprehensible such misconduct.

Appellee cannot recover upon the ground that he was slandered by anything said to him by Schoonover. To curse one or say to him or of him that he wanted to be hurt, does not constitute slander, nor were the words used actionable *per se*. Moreover, to make the master liable for a slander uttered or published by the servant, it must be made to appear that when they were uttered the servant was acting within the apparent scope of his employment, or that his act was authorized or ratified by the master. Case v. Steele Coal Co., 162 Ky. 69; Pa. Iron Wks. v. Vogt Machine Co., 139 Ky. 497; Newell on Slander and Libel, page 373; Burgess & Co. v. Patterson, 32 R. 624. Appellee did not allege or attempt to prove that he had been injured in his character or reputation by reason of the words spoken by Schoonover to him. His sole complaint seems to be that he was only mortified and injured in his feelings by what Schoonover said and did to him, and this, as we have already said, in the absence of accompanying physical injury, is not actionable and did not authorize a recovery by him of damages against the appellants or either of them.

That appellee was not entitled to recover at all makes it unnecessary for us to pass on the instructions that were given by the trial court, further than to say, they should not have been given at all, as appellants were entitled to a peremptory instruction directing the jury to find for them.

For the reasons indicated appellant's prayer for an appeal is granted, the judgment is reversed and cause remanded for a new trial consistent with the opinion.